UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                           Case No. 23-CR-69

JAIDEN HENNING,

          Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Patricia Daugherty, Assistant United States Attorney, and the defendant, Jaiden Henning, individually and by attorney Matthew Ricci, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in five counts of a thirty-one count indictment, which alleges violations of Title 21 United States Code, Sections 846, 841(b)(1)(A), 841(b)(1)(B), and 841(b)(1)(C), and Title 18 United States Code, Sections 2(a), 922(o), 924(a)(2), and 933(a)(1).

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about September 12, 2022, in the State and Eastern District of Wisconsin,

**AZJUAN K. MERIWETHER and
JAIDEN A. HENNING**

did knowingly conspire and agree with each other, and others, known and unknown to the Grand Jury, to ship, transport, transfer, cause to be transported, and otherwise dispose of a firearm, that is, a machinegun-conversion device, to another person, in and affecting interstate commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of a machinegun-conversion device by the recipient would constitute a felony, as defined in section 932(a)).

In violation of Title 18, United States Code, Sections 933(a)(1) and 2(a).

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that the facts in Attachment A are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: up to 15 years and

$250,000. Said count also carries a mandatory special assessment of $100, and a maximum of three years of supervised release.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## **DISMISSAL OF REMAINING COUNTS**

8. The government agrees to move to dismiss the remaining counts of the indictment as to this defendant at the time of sentencing.

## **ELEMENTS**

9. The parties understand and agree that in order to sustain the charge of Firearm Trafficking, as set forth in Count Nine, the government must prove each of the following propositions beyond a reasonable doubt:

> First: The defendant knowingly shipped, transported, transferred, caused to be transported or disposed of a firearm that is a machinegun-conversion device, to another person;

> Second: The shipping, transporting, transferring, causing to be transported or disposition of the firearm was in or otherwise affecting interstate commerce; and

> Third: The defendant knew or had reasonable cause to believe that the use, carrying or possession of the firearm that is a machinegun-conversion device by the other person/recipient would constitute a state or federal felony.

## **SENTENCING PROVISIONS**

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the

4

sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Nine is 18 under Sentencing Guidelines Manual § 2K2.1(a)(5).

## Specific Offense Characteristics

17. The parties agree to recommend to the sentencing court that the following enhancements are applicable to the base offense level for the offense charged in Count Nine: a 2-level increase for multiple firearms under Sentencing Guidelines Manual § 2K2.1(b)(1)(A) and and a 2-level increase for transferring a firearm knowing that such conduct would result in the receipt of the firearm by an individual who intended to dispose of the firearm unlawfully under § 2K2.1(b)(5)(B)(i)(II). The parties acknowledge and understand that the government will recommend a 4-level increase because the firearm was used or possessed in connection with another felony offense under Sentencing Guidelines Manual § 2K2.1(b)(6)(B) and that the defense will not join in that recommendation.

## Acceptance of Responsibility

18. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level

5

decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

**Sentencing Recommendations**

19. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

21. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

**Court's Determinations at Sentencing**

22. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the

sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## **FINANCIAL MATTERS**

24. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

### **Fine**

25. The parties agree to recommend to the sentencing court that no fine be imposed.

### **Special Assessment**

26. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### **Forfeiture**

27. The defendant agrees that all properties listed in the indictment constitute the proceeds of the offense to which he is pleading guilty, or were used to facilitate such offense. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The

parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement. The parties agree that the forfeiture of the defendant's properties as described in the indictment will be determined by the court prior to or at the time of sentencing.

## **DEFENDANT'S WAIVER OF RIGHTS**

28. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

   e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

29. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

30. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

31. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

32. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or

Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

33. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

34. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

35. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

36. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

37. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

### VOLUNTARINESS OF DEFENDANT'S PLEA

39. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees

11

that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 06/12/24

Jaiden Henning
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 6/21/24

MATTHEW RICCI
Attorney for Defendant

For the United States of America:

Date: 6/24/24

GREGORY J. HAANSTAD
United States Attorney

Date: 6/24/24

_____
PATRICIA DAUGHERTY
Assistant United States Attorney

# ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon information provided by confidential informants, the anticipated testimony of cooperating sources and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas, and physical and electronic evidence seized throughout the investigation of the conspiracy. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## Overview

Beginning in July 2022, Drug Enforcement Agency (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Waukesha Metro Drug Unit, hereinafter referred to as "case agents," began investigating an armed drug trafficking organization (ADTO) operating in the Eastern District of Wisconsin (WI) which involved Azjuan K. MERIWETHER, Dontrell Q. FRANKLIN, Savanna J. WILLIAMS, Daniel RODRIGUEZ-PEREZ, Brandon M. NICHOLS, Tasha M. BROWN, Laron N. KING, Shannone D. BROWN, Jaiden HENNING, and others. Through confidential sources, undercover controlled buys, physical surveillance, electronic surveillance, and record jail calls case agents learned the ADTO sold fentanyl, purported to be heroin; methamphetamine; cocaine; ghost guns; and switches. Case agents also determined that members of the ADTO used multiple locations and multiple vehicles, including rental vehicles, to store and distribute their narcotics and firearms throughout the Eastern District of Wisconsin.

Starting on July 5, 2022, a confidential source (CS) and an undercover agent (UC) engaged in 18 controlled buys with members of the ADTO. Between July 2022 and March 2023, CS and/or UC obtained approximately 790 grams of heroin, which also field tested positive for fentanyl; 240 grams of methamphetamine; and 155 grams of cocaine from the ADTO during the controlled buys. Additionally, during 10 of the controlled buys, the UC obtained approximately 20 firearms from the ADTO. Some of the firearms were installed with a Glock auto-sear device (switch), which converts a semi-automatic firearm into a full-automatic firearm. Other times, the UC purchased a standalone Glock auto-sear device, i.e., a machinegun conversion device. The UC obtained approximately nine Glock auto-sear devices from the ADTO. ATF test fired the Glock auto-sear devices and determined that they converted a semi-automatic firearm into a fully automatic firearm, meaning one pull of a firearm trigger caused the firearm to fire multiple bullets.

Between August 7, 2022, and October 29, 2022, MERIWETHER's social media account (thereal_chefdon92) and ion.wanna.kickit, identified as HENNING's social media account, communicated about "switches," which are also known as machinegun conversion devices. These devices are subject to the rules and regulations of the National Firearms Act (NFA). During MERIWETHER and HENNING's conversations, they routinely referred to Glock auto-sear devices as "buttons."

1

HENNING's publicly viewable social media profile had photos of HENNING with cash and firearms. Figures 1 to 6 were posted on September 7, 2022. The photos appear to be behind XXXX/XXXX North 50th Street, Milwaukee, WI. Figures 5 and 6 depict a black male possessing what appears to be a Glock handgun and five separate Glock handgun firearm boxes.



(Figure 1)  (Figure 2)  (Figure 3)

(Figure 4)  (Figure 5)  (Figure 6)

a. **September 12, 2022 Transaction with MERIWETHER, FRANKLIN, and HENNING — Counts Eight and Nine**

On September 11, 2022, MERIWETHER and HENNING discussed on Instagram the purchase of a Glock auto-sear device (button or switch). They negotiated a price and MERIWETHER asked, "If it's the metal one." HENNING replied "350 n it's metal." Case agents are aware that individuals are willing to pay top price for the metal conversion devices as the metal conversion devices hold up to the wear and tear of firearms compared to 3D printed plastic machinegun conversion devices. On September 12, 2022 (the date of the undercover purchase), MERIWETHER began communicating with HENNING via Instagram messenger to arrange the

2

transaction for the Glock auto-sear device. MERIWETHER arrived at HENNING's residence (XXXX N. 50th Street, Milwaukee, WI) to obtain the Glock auto-sear device from HENNING at approximately 8:22 a.m. That same day, at approximately 8:42 a.m., MERIWETHER stated, "Even if u got more shit today and tomorrow lmk (let me know) cause he gone be in town today." The UC told MERIWETHER that he would be in town that day. Approximately three hours later, the UC purchased a metal Glock auto-sear device from MERIWETHER.

On September 12, 2022, CS and the UC arranged with MERIWETHER to purchase 25.9 grams of heroin (which later field tested positive for fentanyl), four firearms, and a Glock auto-sear switch for a total of $5,250. The undercover buy took place at XXX North 24th Street, Milwaukee, Wisconsin, which is FRANKLIN's residence. During the transaction, MERIWETHER entered the UC's undercover vehicle and completed a sale of four firearms and a Glock auto-sear switch with the UC. The UC purchased the following firearms and a Glock switch during the transaction in exchange for $4,000:

   i. NAK9 (Draco), 9 MM, Century Arms with a drum magazine, with serial number RON216548;
   ii. RF-15, multi caliber, Radical Firearms, LLC with serial number 21-105263;
   iii. PT111 Millennium G2, 9 mm, Taurus with serial number TKM53277 with an extended magazine; and
   iv. Bodyguard, 38 special, Smith & Wesson with serial number CPX2831.

HENNING acknowledges that he provided MERIWETHER with this auto-sear device/switch. HENNING further admits that he knowingly possessed this auto-sear device/switch on September 12, 2022 and admits that he knew this device was a machinegun. He further admits and agrees that the auto-sear device/switch that he possessed and transferred to MERIWETHER is a machinegun insofar as it is meets this definition:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b).

During the same transaction, MERIWETHER completed the sale of 25.9 grams of heroin to CS in exchange for $1,250. MERIWETHER was observed by CS to possess "half a brick" of heroin during the transaction (approximately 500 grams). FRANKLIN was inside MERIWETHER's vehicle. MERIWETHER informed CS during the transaction that this location

3

is where his "cousin" (FRANKLIN) resided, and MERIWETHER was heard confirming the address when asked by CS where he (MERIWETHER) was just prior to the transaction. MERIWETHER also discussed posting bail for FRANKLIN when he was arrested with a firearm.

During this transaction, MERIWETHER and UC discussed whether the firearms being sold were previously used in other criminal offenses. MERIWETHER stated that the only firearm he knew to be "legal" was the AR-style rifle he had just sold. UC asked if any of the firearms were "valid" (meaning not stolen or used in a shooting) and MERIWETHER replied, "The only one I don't know about is the revolver…the two handguns. But I know both the chops [meaning the AK-style and AR-style firearms] is good. I got the handgun, I got the handgun from the same dude I got the nine, the Draco-nine from. So it might be good as well, but you just never know with handguns."

MERIWETHER called the UC following the transaction and discussed additional firearms that FRANKLIN had for sale. Based on the investigation into the ADTO, case agents identified that Jaiden HENNING provided MERIWETHER with the Glock auto-sear device, described above.

Jaiden HENNING admits that he knowingly transferred this machinegun (auto-sear device/switch) to another person (MERIWETHER), that this transfer was in or otherwise affecting interstate commerce, and he knew that MERIWETHER's possession or use of that machinegun (auto-sear device/switch) constituted a state or federal felony.

Specifically, Jaiden HENNING understood that MERIWETHER intended to resell the machinegun, despite the MERIWETHER not being a licensed manufacturer or dealer of firearms, which itself is a violation of 18 U.S.C. § 922(a)(1)(A), and the defendant knew that it is unlawful for anyone, including MERIWETHER, to possess the machinegun (auto-sear device) which is a violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

   b.     **October 5, 2022 Transaction with MERIWETHER & Sourced by HENNING**

On October 5, 2022, UC purchased two firearms from MERIWETHER (a .40 Caliber Glock, model 22 (serial number BVK7876)[1] with Glock auto-sear device attached and 14 rounds of ammunition and a Multi Caliber Franklin Armory, model pistol (serial number P-17412) with 10 rounds of ammunition). Case agents' review of the Instagram messaging thread between MERIWETHER and HENNING indicated MERIWETHER had obtained these firearms from HENNING around September 29, 2022.

---

[1] This firearm appeared to be connected to two other incidents regarding shots fired on March 22, 2022 and April 18, 2022.

HENNING acknowledges that he provided MERIWETHER with these two firearms, the ammunition, and the auto-sear device. He further admits and agrees that the auto-sear device/switch that he possessed and transferred to MERIWETHER is a machinegun. HENNING admits that he knowingly transferred this machinegun (auto-sear device/switch) and two firearms to another person (MERIWETHER), that this transfer was in or otherwise affecting interstate commerce, and he knew that MERIWETHER's possession of that machinegun (auto-sear device/switch) and two firearms constituted a state or federal felony.

On September 21, 2022, MERIWETHER messaged HENNING: "Wat u got around." HENNING responded: "Shit rn (right now) it's dry ima lyk (let you know)." On September 25, 2022, HENNING messaged MERIWETHER: "U still tryna gram sum?" MERIWETHER responded: "Yeah imma be back Tuesday." HENNING then stated: "Fs (for sure) Iaa (I'm going to) have sum," and also sent MERIWETHER a photograph of an AR-Pistol that matched the one later purchased by UC. On September 27, 2022, HENNING and MERIWETHER discussed the Glock firearm's binary trigger and "button" (Glock auto-sear device). HENNING and MERIWETHER then discussed prices and eventually agreed to meet and sell the firearms. MERIWETHER did not have enough cash but offered to provide HENNING with "grits" of "b" or "g" (grams of "boy" (heroin) or "girl" (cocaine)). When MERIWETHER is on his way to HENNING's residence he requested HENNING bring a "scat" (scale). This supports MERIWETHER's exchange of controlled substances for firearms.

c. **October 19, 2022 Transaction**

On October 14, 2022, HENNING sent MERIWETHER several Instagram messages, explaining that HENNING obtained five Glock auto-sear devices that were available to be purchased by MERIWETHER. HENNING informed MERIWETHER the price for each Glock auto-sear device would be $400. On this same date, approximately 19 minutes after HENNING messaged MERIWETHER, MERIWETHER contacted UC about purchasing switches, citing that MERIWETHER's source had just obtained multiple switches. HENNING admits that he commuicated with MERIWETHER concerning these switches and made efforts to acquire them, but never obtained them and made up a story for MERIWETHER to explain why he did not have them.

d. **November 16, 2022 Transaction with MERIWETHER and HENNING–Counts Fifteen and Sixteen**

On September 12, 2022, HENNING, messaged MERIWETHER "I can build them mfs for $400 tho, I got the parts alr I just gotta go grab a lower, I got the upper ready." Based on case agents training and experience, HENNING's statements are consistent with HENNING discussing the manufacturing of an AR-15 style firearm. The "lower" part of an AR-15 style platform is classified as the firearm and can be purchased from a federal firearms licensed dealer (FFL). The "upper" can be purchased online and wherever people sell gun parts. Assembling a lower and upper complete an AR-15 style platform rifle. Based on training and experience, case agents are aware people who are able to legally purchase firearms, will buy the lower from an FFL. The remaining parts will then be purchased separately to assemble a fully functioning rifle.

On November 16, 2022, MERIWETHER met CS and the UC at North 55th and West Keefe

Avenue, Milwaukee, WI. MERIWETHER approached the UC's vehicle and entered via the rear driver's side door. MERIWETHER had a large black duffle style bag with him and completed the transactions with the UC and CS. MERIWETHER provided 27.6 grams of heroin (later field tested positive for fentanyl) to CS. CS provided MERIWETHER with $5,000 to cover the purchase of the 27.6 grams of heroin and as a buy-in to a "brick of heroin" (approximately 1,000 grams). MERIWETHER provided the UC with a firearm, later identified as an AM-15, Anderson Manufacturing Pistol with serial number 22019470, with 26 rounds of ammunition. UC provided $1500 to MERIWETHER in exchange for the AM-15.

Prior to meeting, MERIWETHER discussed the possible sale of a "ghost" gun with UC. MERIWETHER stated the "ghost" gun was currently possessed by his cousin. Case agents know through training and experience that "ghost guns" are privately manufactured firearms, often assembled from pre-made kits, that do not possess serial numbers or other identifying markings, which make the firearms difficult to trace back to an original purchaser/manufacturer. MERIWETHER told UC that his "cousin" just "caught a ghost case," but wanted to keep this new "ghost" gun. After this controlled buy, case agents surveilled MERIWETHER to the address of XXXX North 55th Street, Milwaukee, WI. Case agents observed HENNING exit MERIWETHER's vehicle and walk to the side door of the duplex. Case agents learned that HENNING was providing MERIWETHER with a firearm on November 16, 2022.

The firearm purchased from MERIWETHER was originally obtained by Trenell HENNING, Jaiden HENNING's father, just six days prior to this transaction.

Case agents obtained ATF Form 4473 from Fleet Farm located at NXX WXXXXX County Line Road, Germantown, Wisconsin detailing the purchase of one Anderson Manufacturing receiver, model AM-15, bearing serial number 22019470. On November 4, 2022, Trenell HENNING completed the paperwork for the firearm. Initially, Trenell HENNING was delayed by the FBI NICS system. Trenell HENNING then obtained the firearm from Fleet Farm on November 10, 2022. On the Fleet Farm Firearms order form, Trenell HENNING listed his phone number as 414-XXX-XXX5. Under question 11a which stated "Are you the actual transferee/buyer of the firearm(s) listed?" Trenell HENNING marked "yes". Six days later this firearm was sold to UC by Meriwether with Jaiden HENNING in MERIWETHER's vehicle.

Jaiden HENNING admits that he knowingly transferred this firearm to another person (MERIWETHER), that this transfer was in or otherwise affecting interstate commerce, and he knew that MERIWETHER's possession, use, or carrying of that firearm would constituted a state or federal felony.

Case agents reviewed call detail records between Jaiden HENNING (414-XXX-XXXX5) and MERIWETHER (414-XXX-XXX2). Between February 19, 2022 and MERIWETHER's arrest in December, Jaiden HENNING and MERIWETHER were in contact 19 times. Those contacts included three calls between Meriwether and Jaiden HENNING prior to the October 5, 2022 controlled firearm purchase, two calls prior to November 15, 2022, and four calls on November 16, 2022, the day of the controlled firearm purchase.

6