UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                             Case No. 23-CR-69

AZJUAN K. MERIWETHER,

        Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Katherine M. Halopka-Ivery and Patricia I. Daugherty, Assistant United States Attorneys, and the defendant, Azjuan K. Meriwether, individually and by attorney Richard Hart, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in sixteen counts of a thirty-one-count indictment, which alleges violations of Title 18, United States Code, Sections 2(a), 922(o), 924(a)(2), 924(c)(l)(A)(i), 933(a)(1), and Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(C), and 846.

3.     The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

1.     Beginning in at least July 2022 and continuing until on or about March 28, 2023, in the State and Eastern District of Wisconsin and elsewhere,

**AZJUAN K. MERIWETHER,**
**DONTRELL Q. FRANKLIN,**
**TASHA M. BROWN,**
**SAVANNA J. WILLIAMS,**
**LARON N. KING, and**
**JAIDEN A. HENNING,**

knowingly and intentionally conspired with each other and others, known and unknown to the Grand Jury, to possess with the intent to distribute and to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1).

2.     The amount of controlled substances involved in the conspiracy attributable to each defendant as a result of his or her own conduct, and the conduct of other conspirators reasonably foreseeable to each of them, included 400 grams or more of a mixture and substance containing N-phenyl-N-[1-( 2-phenylethyl ) -4-piperidinyl] propanamide (fentanyl), a Schedule II controlled substance; 50 grams or more of actual methamphetamine, a Schedule II controlled substance; 100 grams or more of a mixture and substance containing heroin, a Schedule I controlled substance; and a mixture and substance containing cocaine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), 841(b)(1)(B), and 841(b)(1)(C), and Title 18, United States Code, Section 2(a).

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

2

On or about August 29, 2022, in the State and Eastern District of Wisconsin,

## AZJUAN K. MERIWETHER

knowingly possessed a firearm in furtherance of the drug trafficking offenses charged in Counts One and Five of this Indictment.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about September 12, 2022, in the State and Eastern District of Wisconsin,

## AZJUAN K. MERIWETHER and
## JAIDEN A. HENNING

did knowingly conspire and agree with each other, and others, known and unknown to the Grand Jury, to ship, transport, transfer, cause to be transported, and otherwise dispose of a firearm, that is, a machinegun-conversion device, to another person, in and affecting interstate commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of a machinegun-conversion device by the recipient would constitute a felony, as defined in section 932(a)).

In violation of Title 18, United States Code, Sections 933(a)(1) and 2(a).

5.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

3

## PENALTIES

6. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: Count One, up to life imprisonment and $10 million fine; Count Six, up to life imprisonment and $250,000 fine; Count Nine, up to 15 years imprisonment and $250,000. Count One also carries a mandatory minimum of 10 years of imprisonment. Count Six also carries a mandatory minimum of 5 years of imprisonment, which must be consecutive to any other sentence. Each count also carries a mandatory special assessment of $100. Count One carries at least 5 years of supervised release and a maximum of life. Count Six carries up to 5 years of supervised release. Count Nine carries up to 3 years of supervised release.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss the remaining counts of the indictment as to this defendant at the time of sentencing.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9. The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(A) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 400 grams or more of a mixture and substance containing N-phenyl-N-[1-( 2-phenylethyl )-4-piperidinyl] propanamide (fentanyl), a Schedule II controlled substance; 50 grams or more of actual methamphetamine, a Schedule II controlled substance; or 100 grams or more of a mixture and substance containing heroin, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

4

## ELEMENTS

10.    The parties understand and agree that in order to sustain the charge of conspiracy to distribute and possess with the intent to distribute controlled substances as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy existed; and
> Second, the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

11.    The parties understand and agree that in order to sustain the charge of possession of a firearm in furtherance of a drug trafficking crime as set forth in Count Six, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the defendant committed the crime of conspiracy to distribute and possess with the intent to distribute a controlled substance;
> Second, the defendant knowingly possessed a firearm; and
> Third, the defendant's possession of the firearm was in furtherance of the possession with intent to distribute a controlled substance.

12.    The parties understand and agree that in order to sustain the charge of firearm trafficking, as set forth in Count Nine, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the defendant knowingly shipped, transported, transferred, caused to be transported or disposed of a firearm that is a machinegun-conversion device, to another person;
> Second, the shipping, transporting, transferring, causing to be transported or disposition of the firearm was in or otherwise affecting interstate commerce; and
> Third, the defendant knew or had reasonable cause to believe that the use, carrying or possession of the firearm that is a machinegun-conversion device by the other person/recipient would constitute a state or federal felony.

## SENTENCING PROVISIONS

13.    The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before

the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

14. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

15. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

16. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

17. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

6

18. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

19. The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is more than 90,000 kilograms of converted drug weight, which consists of 32 kilograms of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) - 4-piperidinyl ] propanamide (fentanyl), Schedule II controlled substance; 376.34 grams of para-fluorofentanyl (fentanyl analogue), a Schedule II controlled substance; 7 pounds of methamphetamine, a Schedule II controlled substance; and 29.72 grams of cocaine, a Schedule II controlled substance.

## Base Offense Level

20. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 38 under Sentencing Guidelines Manual § 2D1.1(c)(1). The parties also acknowledge and understand that pursuant to Sentencing Guidelines Manual § 2.K2.4(b), the guideline sentence in Count Six is the five-year minimum term of imprisonment required by statute. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Nine is 20 under Sentencing Guidelines Manual § 2K2.1(a)(4)(B).

## Specific Offense Characteristics

21. The parties agree to recommend to the sentencing court that a four-level increase is applicable to Count Nine charged for multiple firearms under Sentencing Guidelines Manual § 2K2.1(b)(1)(B).

7

22.     The parties agree to recommend to the sentencing court that a five-level increase is applicable to Count Nine for transferring a firearm knowing that such conduct would result in the receipt of the firearm by an individual who intended to use or dispose of the firearm unlawfully under § 2K2.1(b)(5)(C)(i)(III).

23.     The parties agree to recommend to the sentencing court that a two-level increase is applicable to Count One charged under Sentencing Guidelines Manual § 2D1.1(b)(12) because the defendant maintained a premises for the purpose of distributing a controlled substance.

24.     The parties agree to recommend to the sentencing court that a four-level increase is applicable to Count One under Sentencing Guidelines Manual § 2D1.1(b)(13)(A) because the defendant knowingly misrepresented a mixture or substance containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide) as another substance (heroin).

### Weapons

25.     The defendant acknowledges and understands, with respect to Count Six, the Court must impose at least a five-year term of imprisonment to run consecutive to the punishment to be imposed for Counts One and Nine.

### Role in the Offense

26.     Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties agree to recommend to the sentencing court that a four-level increase be given for an aggravating role in the offense, as the defendant was an organizer or leader of a criminal activity that involved five or more participants.

### Reckless Endangerment During Flight Enhancement

27.     The parties agree to recommend to the sentencing court that a two-level increase for reckless endangerment during flight under Sentencing Guidelines Manual § 3C1.2 is applicable to the offense level charged in Count One.

8

## Acceptance of Responsibility

28.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

29.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

30.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

31.     The government agrees to recommend a sentence of 180 months imprisonment.

## Court's Determinations at Sentencing

32.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in

9

paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

33.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

34.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

### Fine

35.     The parties agree to recommend to the sentencing court that no fine be imposed.

### Special Assessment

36.     The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### Forfeiture

37.     The defendant agrees that all properties listed in the indictment constitute the proceeds of the offenses to which he is pleading guilty, or were used to facilitate such offenses.

10

The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S WAIVER OF RIGHTS

38.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.     At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

11

39.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

40.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

41.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

42.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights

12

and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

**GENERAL MATTERS**

43.　　The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

44.　　The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

45.　　The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

46.　　The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

**EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT**

47.　　The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all

13

charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

48.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

14

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 11-12-24

AZJUAN K. MERIWETHER
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 11-12-24

RICHARD HART
Attorney for Defendant

For the United States of America:

Date: 11/12/2024

for GREGORY J. HAANSTAD
United States Attorney

Date: 11/12/2024

KATHERINE M. HALOPKA-IVERY
PATRICIA L. DAUGHERTY
Assistant United States Attorneys

15

## ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon information provided by confidential informants, the anticipated testimony of cooperating sources and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas, and physical and electronic evidence seized throughout the investigation of the conspiracy. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

### Overview

Beginning in July 2022, Drug Enforcement Agency (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Waukesha Metro Drug Unit, hereinafter referred to as "case agents," began investigating an armed drug trafficking organization (ADTO) operating in the Eastern District of Wisconsin (WI) which involved Azjuan K. MERIWETHER, Dontrell Q. FRANKLIN, Savanna J. WILLIAMS, Daniel RODRIGUEZ-PEREZ, Brandon M. NICHOLS, Tasha M. BROWN, Laron N. KING, Shannone D. BROWN, Jaiden HENNING, and others. Through confidential sources, undercover controlled buys, physical surveillance, electronic surveillance, and recorded jail calls, case agents learned that the ADTO sold fentanyl, which they purported to be heroin; methamphetamine; cocaine; ghost guns; and machinegun conversion devices (i.e., "switches"). Case agents also determined that members of the ADTO used multiple locations and multiple vehicles, including rental vehicles, to store and distribute their narcotics and firearms throughout the Eastern District of Wisconsin.

### A. CONTROLLED BUYS

Starting on July 5, 2022, a confidential source (CS) and an undercover agent (UC) engaged in 18 controlled buys with members of the ADTO including MERIWETHER, FRANKLIN, WILLIAMS, RODRIGUEZ-PEREZ, NICHOLS, HENNING, and KING. Between July 2022 and March 2023, the CS and/or UC obtained approximately 790 grams of heroin, which also field tested positive for fentanyl; 240 grams of methamphetamine; and 155 grams of cocaine from the ADTO during the controlled buys. Additionally, during 10 of the controlled buys, the UC obtained approximately 20 firearms from the ADTO. Some of the firearms were installed with a Glock auto-sear device (switch), which converts a semi-automatic firearm into a fully automatic firearm. During some of the controlled buys, the UC purchased a standalone Glock auto-sear device, i.e., a machinegun conversion device, or a switch. The UC obtained approximately nine Glock auto-sear devices (switches) from the ADTO. ATF test fired the Glock auto-sear devices and determined that they converted a semi-automatic firearm into a fully automatic firearm, meaning one pull of a firearm trigger caused the firearm to fire multiple bullets.

MERIWETHER was involved in at least sixteen controlled buys. MERIWETHER would obtain large amounts of controlled substances for the ADTO and would direct other ADTO members' conduct. During the controlled buys, MERIWETHER and/or the other ADTO member(s) sold heroin ("boy") to the CS and UC, knowing that the ADTO cut the heroin with fentanyl, in order to expand the ADTO's profits. The following is a representative sample of the

controlled buys conducted as part of this investigation:

### a. July 8, 2022 Transaction with MERIWETHER and WILLIAMS

On Friday, July 8, 2022, CS coordinated a purchase of approximately 50.2 grams of suspected heroin for $2,500 from MERIWETHER. MERIWETHER had informed CS that he had to go to Indiana, but WILLIAMS was going to complete the heroin transaction that morning. CS met with WILLIAMS in her Mazda at XXXX North Green Bay Road, Brown Deer, Wisconsin. CS provided $2,500.00 to WILLIAMS. CS indicated there was also a small child inside the Mazda. The suspected heroin also tested positive for fentanyl.

### b. August 22, 2022 Transaction with MERIWETHER, RODRIGUEZ-PEREZ, and S. BROWN

On August 22, 2022, CS coordinated a purchase of approximately 25.4 grams of heroin for $1,250 from RODRIGUEZ-PEREZ. The transaction was completed at the direction of MERIWETHER. MERIWETHER contacted CS earlier that morning and informed CS that his crew was attempting to sell off their large quantities of heroin so they could obtain a large amount of cash to post bail for another member of the ADTO (Dontrell FRANKLIN). MERIWETHER informed CS that he was still in Indiana, but RODRIGUEZ-PEREZ would conduct the transaction. CS met RODRIGUEZ-PEREZ at XXXX West Hampton Avenue, Butler, Wisconsin. Shannone BROWN was in the front passenger seat at the time of the transaction. During the transaction, RODRIGUEZ-PEREZ entered CS's vehicle and completed the transaction. The controlled substance tested inconclusive for heroin but tested positive for fentanyl.

### c. August 29, 2022 Transaction with MERIWETHER and NICHOLS

On August 29, 2022, law enforcement conducted an undercover controlled buy. During the undercover controlled buy, CS and UC arranged to purchase 111.4 grams of heroin (which later field tested positive for fentanyl), and one Glock auto-sear device from MERIWETHER. The controlled buy took place at XXXX West North Avenue, Milwaukee, Wisconsin. The original transaction was for the Glock auto-sear switch, but when MERIWETHER entered the vehicle, he informed the UC that someone was bringing the "switch." During this time, MERIWETHER completed the heroin transaction for $2500 with CS.

The UC and MERIWETHER discussed a handgun that was on MERIWETHER's person. During the discussion, MERIWETHER indicated he would not sell it for less than a "band" ($1,000) and that the gun was his "top gun right now." MERIWETHER eventually agreed to sell the handgun, which was identified as Glock, model 21, .45 caliber handgun, with serial number DST613US. The Glock was loaded with 13 rounds of mixed .45 caliber ammunition, including one round of ammunition in the chamber. Also, during this meeting, MERIWETHER stated, "Bro I get guns from the ghetto all the time, bro. Like do you only prefer Glocks or it doesn't matter like all types of guns?" MERIWETHER also discussed his experience with Glock auto-sear devices, i.e., switches, during this meeting. MERIWETHER stated "Switches be so crazy that you can't even... certain ones like if you pull the trigger you can't you, can't let go of the trigger

2

otherwise its gonna jam. You gotta empty the whole clip. I've had several switches that they didn't even let you."

A short time later, NICHOLS arrived at the location. NICHOLS provided MERIWETHER with a bag that contained the Glock auto-sear device and MERIWETHER subsequently completed the transaction with the UC in exchange for money.

### d. September 12, 2022 Transaction with MERIWETHER, FRANKLIN, and HENNING

Between September 11, 2022 and September 12, 2022, MERIWETHER and HENNING arranged via Instagram the purchase of a Glock auto-sear device, i.e., button or switch.

On September 12, 2022, CS and the UC arranged with MERIWETHER to purchase 25.9 grams of heroin (which later field tested positive for fentanyl), four firearms, and a Glock auto-sear switch for a total of $5,250. The undercover buy took place at XXX North 24th Street, Milwaukee, Wisconsin, which is FRANKLIN's residence. During the transaction, MERIWETHER entered the UC's undercover vehicle and completed a sale of four firearms and a Glock auto-sear, i.e., switch, with the UC. The UC purchased the following firearms and a Glock switch during the transaction in exchange for $4,000:

> i. a Century Arms, model NAK9 (Draco), 9mm pistol with a drum magazine, with serial number RON216548;
> ii. a Radical Firearms, LLC, model RF-15, multi-caliber, pistol with serial number 21-105263;
> iii. a Taurus, model PT111 Millennium G2, 9mm pistol with serial number TKM53277 with an extended magazine; and
> iv. a Smith & Wesson, model Bodyguard, 38 special pistol with serial number CPX2831.

MERIWETHER acknowledges that he provided the UC with this auto-sear device/switch. MERIWETHER further admits that he knowingly possessed this auto-sear device/switch on September 12, 2022 and admits that he knew this device was a machinegun. He further admits and agrees that the auto-sear device/switch that he possessed and transferred to UC is a machinegun insofar as it is meets this definition:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which

3

a machinegun can be assembled if such parts are in the possession or under the control of a person. 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b).

During the same transaction, MERIWETHER completed the sale of 25.9 grams of heroin to CS in exchange for $1,250. MERIWETHER possessed a "half a brick" of suspected heroin during the transaction (approximately 500 grams). FRANKLIN was inside MERIWETHER's vehicle.

During this transaction, MERIWETHER and UC discussed whether the firearms MERIWETHER was selling were previously used in other criminal offenses. MERIWETHER stated that the only firearm he knew to be "legal" was the AR-style rifle he had just sold. UC asked if any of the firearms were "valid" (meaning not stolen or used in a shooting) and MERIWETHER replied, "The only one I don't know about is the revolver...the two handguns. But I know both the chops [meaning the AK-style and AR-style firearms] is good. I got the handgun, I got the handgun from the same dude I got the nine, the Draco-nine from. So it might be good as well, but you just never know with handguns."

MERIWETHER admits that he knowingly transferred this machinegun (auto-sear device/switch) to another person (UC), that this transfer was in or otherwise affecting interstate commerce, and he knew that UC's possession or use of that machinegun (auto-sear device/switch) constituted a state or federal felony.

Specifically, MERIWETHER knew that it is unlawful for anyone, including the UC, to possess the machinegun (auto-sear device), which is a violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

e. **September 22, 2022 Transaction with MERIWETHER and FRANKLIN**

On September 22, 2022, CS and the UC met MERIWETHER at XXXX North 24th Street, Milwaukee, Wisconsin (FRANKLIN's residence) to purchase guns and heroin. CS and the UC arrived at the location and parked behind MERIWETHER's Elantra. MERIWETHER was outside the Elantra, and FRANKLIN was later observed inside the front passenger seat of the Elantra. CS initially got out of the vehicle to approach MERIWETHER, but MERIWETHER directed CS to return to the vehicle. MERIWETHER and CS then returned to the UC's vehicle. MERIWETHER brought with him the following:

i.   a Freedom Ordinance, model FX-9, AR-style pistol bearing serial number 010897 with an extended magazine;
ii.  a Glock, model 19X, 9mm pistol bearing serial number BKCC540 with an extended magazine and 28 rounds of ammunition; and
iii. a Glock, model 21, .45 caliber pistol bearing serial number XNS459 with an attached switch and 11 rounds of ammunition.

4

CS provided MERIWETHER $2500 and MERIWETHER provided CS with 50.1 grams of heroin. While examining the Glock 19X with the switch, the UC noticed the switch was different than the switch purchased during the controlled buy on September 12, 2022. MERIWETHER stated that FRANKLIN received the first switch from Texas, and that FRANKLIN also has a Glock switch source in Kentucky, who uses a 3D printer. MERIWETHER, referencing the Glock 21, stated, "That motherfucker, yeah, that's been the one that's been put to use. We've had that one for at least a year and a half." MERIWETHER also discussed the sale of a Taurus, model Judge, .45 caliber revolver to UC. The UC provided $4000 for the three firearms obtained from MERIWETHER.

MERIWETHER then informed the UC that he had also sold all of his methamphetamine. MERIWETHER then discussed a future sale of methamphetamine with the UC. The UC requested to purchase heroin from MERIWETHER because he no longer had methamphetamine to sell. MERIWETHER went back to his Elantra, where FRANKLIN was still seated, and then returned to the UC's vehicle. MERIWETHER handed the UC his hat, which contained approximately 6.66 grams of heroin. The UC provided MERIETHER his hat and $300.

Case agents later field tested the heroin provided to CS and the UC, which tested positive for fentanyl.

  **f. October 5, 2022 Transaction with MERIWETHER & Sourced by HENNING**

On October 5, 2022, UC purchased two firearms from MERIWETHER, a Glock, model 22, .40 caliber firearm bearing serial number BVK7876[1] with a Glock auto-sear device attached and 14 rounds of ammunition and a Franklin Armory pistol bearing serial number P-17412 with 10 rounds of ammunition. Case agents reviewed the Instagram messaging thread between MERIWETHER and HENNING, which showed that HENNING provided MERIWETHER with these two firearms, the ammunition, and the auto-sear device on approximately September 29, 2022.

MERIWETHER acknowledges that he provided UC with these two firearms, the ammunition, and the auto-sear device. He further admits and agrees that the auto-sear device/switch that he possessed and transferred to UC is a machinegun. MERIWETHER admits that he knowingly transferred this machinegun (auto-sear device/switch) to another person (UC), that this transfer was in or otherwise affecting interstate commerce, and he knew that UC's possession of that machinegun (auto-sear device/switch).

MERIWETHER now admits that he provided HENNING with controlled substances in exchange for the two firearms, the ammunition, and the auto-sear device.

  **g. October 27, 2022 Transaction with MERIWETHER and FRANKLIN**

---

[1] This firearm appeared to be connected to two other incidents regarding shots fired on March 22, 2022 and April 18, 2022.

On October 27, 2022, the UC conducted a controlled buy with MERIWETHER at XXXX North Mayfair Road, Wauwatosa, WI. FRANKLIN was also with MERIWETHER as the front seat passenger in a Chevrolet Malibu. During the controlled buy, the UC purchased 110.1 grams of methamphetamine in exchange for $1,380 and three handguns all equipped with Glock auto-sear devices, i.e., switches. The firearms contained magazines loaded with ammunition. The UC purchased the following items from MERIWETHER:

     i. a Glock, model 22, .40 caliber pistol bearing serial number WHX146 with 13 rounds of ammunition and a Glock auto-sear device;
     ii. a Glock, model 17, 9mm pistol bearing serial number BTVX769 with 11 rounds of ammunition and a Glock auto-sear device; and
     iii. a Glock, model 17, 9mm pistol bearing serial number BVBN256 with 30 rounds of ammunition, an extended magazine, and a Glock auto-sear device.

During the controlled buy, MERIWETHER stated that the firearms were "brand new," but one of the firearms, a Glock 17 pistol, had "been through some shit" in Indiana. Case agents understood this to mean that the firearm had been used in a shooting incident in Indiana. MERIWETHER also discussed purchasing and selling larger quantities of illegal narcotics with the UC and indicated that MERIWETHER's "cousin" has a source for narcotics. MERIWETHER stated that he and his "cousin" would be splitting the profits from the sale of the handguns. MERIWETHER then discussed the fact that he had bailed his "cousin" out of jail for $20,000 and was still waiting to be paid back.

MERIWETHER then informed the UC that he had just "gotten rid of" five pounds of methamphetamine and would be able to get him two pounds by next week. MERIWETHER stated that "it's really my cousin" who gets "the pounds." MERIWETHER then exited UC's vehicle, entered the Malibu, and left the area.

**h. November 16, 2022 Transaction with MERIWETHER and HENNING**

On November 16, 2022, MERIWETHER met CS and the UC at North 55th and West Keefe Avenue, Milwaukee, WI. MERIWETHER approached the UC's vehicle and entered via the rear driver's side door. MERIWETHER had a large black duffle bag with him and completed the transactions with the UC and CS. MERIWETHER provided 27.6 grams of heroin (later field tested positive for fentanyl) to CS. CS provided MERIWETHER with $5,000 to cover the purchase of the 27.6 grams of heroin and as a "buy-in" to a "brick of heroin" (approximately 1,000 grams of heroin). MERIWETHER provided the UC with a firearm, later identified as an Anderson Manufacturing, model AM-15, pistol bearing serial number 22019470 with 26 rounds of ammunition. UC provided $1500 to MERIWETHER in exchange for the AM-15.

Prior to meeting, MERIWETHER discussed the possible sale of a "ghost" gun with the UC. MERIWETHER stated that his cousin currently had the "ghost" gun. Case agents know through training and experience that "ghost guns" are privately manufactured firearms, often assembled from pre-made kits, that do not possess serial numbers or other identifying markings, which make the firearms difficult to trace back to an original purchaser/manufacturer.

6

MERIWETHER told the UC that his "cousin" just "caught a ghost case," but wanted to keep this new "ghost" gun. After this controlled buy, case agents surveilled MERIWETHER to the address of XXXX North 55th Street, Milwaukee, WI. Case agents observed HENNING exit MERIWETHER's vehicle and walk to the side door of the duplex. Case agents learned that HENNING provided MERIWETHER with a firearm on November 16, 2022.

The firearm purchased from MERIWETHER was originally obtained by Trenell Henning, Jaiden HENNING's father, just six days prior to this transaction.

### o. December 6, 2022 - Transaction with MERIWETHER

Prior to meeting on December 6, 2022, MERIWETHER sent the UC photos of two "brand new" Draco pistols with drum magazines and two extended magazines and indicated that he would sell them to the UC. MERIWETHER had informed the UC and CS that he was going to travel to Texas or Tennessee to pick up multiple "kilos of heroin." MERIWETHER provided an address to the UC of XXXX North 60th Street, Milwaukee, WI to meet.

On December 6, 2022, the UC and CS entered XXXX North 60th Street and met with MERIWETHER, who was allegedly alone. The residence on North 60th Street was one of the premises MERIWETHER maintained for the purpose of manufacturing or distributing controlled substances. MERWIETHER escorted the UC and CS to the kitchen where the drug transactions were completed. The UC observed an AM-15 pistol and requested to purchase it, which was not originally arranged between the UC and MERIWETHER. MERIWETHER then gave the UC a plastic bag containing a white/tan powder/solid substance, which weighed 233.4 grams and tested positive for fentanyl. The UC then purchased two firearms that were also loaded with ammunition as set forth below:

  i. an Anderson, model AM-15, firearm bearing serial number 19335796 with 40 rounds of ammunition; and
 ii. a Glock, model 45, 9mm pistol bearing serial number BUFB412 with a Glock auto-sear device installed and 17 rounds of ammunition.

MERIWETHER also showed the UC a Glock 17 firearm with a 30-round capacity magazine that was loaded with hollow point ammunition. The UC attempted to purchase the Glock 17, but MERIWETHER did not agree on the price. MERIWETHER later indicated he would sell the Glock 17 to the UC later, that is, after a Glock auto-sear device was installed on the firearm.

MERIWETHER then informed the UC and CS that he "stretched out" the heroin, meaning he mixed the original amount of heroin that he purchased with a cutting agent so that he could increase the quantity of heroin for further distribution. MERIWETHER stated that he purchased 100 grams of heroin, then mixed it with unidentified substances and increased the quantity of heroin to 240 grams. The UC and CS observed blender cups covered in a white powdery substance, and parts belonging to a kilogram press while inside the residence. MERIWETHER then explained that he had stayed up all night mixing the heroin that was provided to the CS and the UC. MERIWETHER then stated he purchased 300 grams of fentanyl from the Houston source when he was in Houston and that he was charged $20,000 for a kilogram of heroin.

MERIWETHER also informed the CS and the UC that he had pints of "promethazine" for "$70 a pint." This statement was consistent with case agents' observations of MERIWETHER's Instagram account, which revealed that he was also selling promethazine.

MERIWETHER informed the CS and the UC that he intended on traveling back to the Houston, TX area "next weekend."

### i. January 19, 2023 – Transaction with KING, FRANKLIN, and T. BROWN

On December 27, 2022, MERIWETHER was arrested in Indiana after a lengthy vehicle pursuit with Indiana state law enforcement. Following MERIWETHER's arrest, the CS and UC arranged a controlled buy with FRANKLIN and KING, with MERIWETHER's assistance, while MERIWETHER was in custody.

On January 19, 2023, CS received a text message from FRANKLIN that he would complete the transaction in front his "house," XXXX North 24th Street, Milwaukee, Wisconsin. At that location, FRANKLIN met with the CS and UC in his girlfriend's (Tasha BROWN) black Jeep. T. Brown was also in the Jeep. FRANKLIN directed the UC to the area of 23rd and Melvina. After parking in the new location, FRANKLIN exited the Jeep and entered the rear door of the UC's vehicle. FRANKLIN completed the heroin transaction with the CS, and the firearm transaction with the UC. The firearm was a Masterpiece Arms Defender, with serial number FX24760, with an extended magazine and 25 rounds of ammunition.

During this conversation, FRANKLIN indicated that he had additional firearms to sell to the UC, but that he needed to get keys to his storage unit. At one point, FRANKLIN pointed the firearm at the UC while trying to eject the live round from the firearm. FRANKLIN also discussed the CS and the UC's agreement to meet with KING to purchase a Glock auto-sear device, i.e., a switch. FRANKLIN indicated that he was also going to purchase two "switches" from KING's people at some point. FRANKLIN also discussed MERIWETHER and his attempts to get MERIWETHER's lawyer everything to be "good." FRANKLIN exited the vehicle, entered the Jeep, and remained at that location for several minutes.

After completing the transaction with FRANKLIN, the CS and the UC went to the next target location, a barbershop at XXXX West North Avenue, Milwaukee, Wisconsin. Upon arrival, the UC parked in front of the barbershop and FRANKLIN arrived shortly thereafter. FRANKLIN spoke with the UC and stated he was waiting on KING to get keys to the house. KING walked up to FRANKLIN in the Jeep, and they met briefly. KING then entered the UC's vehicle via the rear passenger door. In exchange for cash, KING provided the UC with a Glock, model 23, .40 caliber pistol bearing serial number AME521US, which contained 12 rounds of ammunition, with a Glock auto-sear device attached. KING also showed the UC a video with KING shooting the Glock. In the video, KING exited a vehicle, stood in the middle of a residential area, and fired an undetermined number of live rounds. KING also informed the UC, "I actually do got the stick but the stick at home...So, whenever you come back down I got a whole another box, stick, everything." Based on their training, experience, and the investigation to date, case agents believe KING's reference to a "stick" meant either a magazine or a similar device that could accept more

than 15 rounds of ammunition, i.e. an extended magazine or a drum magazine, or a long gun or assault rifle.

Case agents determined the suspected heroin purchased from FRANKLIN tested positive for fentanyl and weighed 51.6 grams.

## B. ADDITIONAL INVESTIGATION

### a. Arrest of MERIWETHER

On December 27, 2022, MERIWETHER was arrested in Indiana after a vehicle pursuit with law enforcement that lasted about two hours. During the pursuit, MERIWETHER drove his vehicle the wrong way on a highway when numerous other people were present, including law enforcement. The pursuit ended when MEIWETHER almost hit law enforcement agents and a member of the local district attorney's office. At the time of arrest, MERIWETHER possessed the following items:

1. 376.34 grams of para-fluorofentanyl and heroin;
2. 165.66 grams of methamphetamine; and
3. 29.72 grams of cocaine.

The narcotics were located in a brown Louis Vuitton bag, which MERIWETHER was in possession of when he exited his vehicle and attempted to flee on foot at the conclusion of the vehicle pursuit. During a search of MERIWETHER's vehicle, law enforcement located two digital scales with a white powdery residue on them, suspected marijuana, several small diamonds, and two cell phones.

MERIWETHER was subsequently charged in Vermillion County, Indiana. Case agents listened to many jails calls that MERIWETHER made while in custody in Indiana. MERIWETHER continued to direct the ADTO while in custody, including reaching out to the UC to verify that other members of the ADTO would contact the UC for future controlled substances and firearm purchases.

### b. December 27, 2022 Surveillance of KING at 5146 North 60th Street, Milwaukee, Wisconsin

Case agents reviewed footage of a pole camera that had been placed in the vicinity of XXX North 60th Street, Milwaukee, Wisconsin, the premises maintained by MERIWETHER for manufacturing and distributing controlled substances. This location was the site of the December 6, 2022 controlled buy. The pole camera was installed on December 27, 2022, just prior to MERIWETHER's arrest in Indiana. While conducting the review of the pole camera, case agents observed KING and others removing the ADTO's controlled substances and firearms from the residence.

### c. Contact between CS, the UC, KING and FRANKLIN following MERIWETHER's arrest.

9

During the week of January 9, 2023, CS conducted a face-to-face meeting with members of the ADTO at Cuttingup Crew barbershop. CS met with KING and discussed MERIWETHER's recent arrest. KING explained that MERIWETHER was involved in a high-speed pursuit with law enforcement. KING added that MERIWETHER's bail was set at $200,000, and there were no current plans within the ADTO to raise the funds needed to get MERIWETHER released from custody. CS discussed his/her previous relationship with MERIWETHER, and KING expressed interest in working with the CS, in place of MERIWETHER. KING stated, "I didn't even know that was you grabbing all that shit. Okay. Them mother fuckers (firearms) still around too. I got two switches right now." CS informed KING that CS had also been purchasing large amounts of heroin and methamphetamine from MERIWETHER and asked, "Do you know what (amounts/types of illegal drugs) we were getting?" KING replied, "Yeah." KING informed CS that in addition to the firearms and switches, there was heroin and methamphetamine that was "still around." These statements are consistent with KING having removed contraband (heroin, methamphetamine, and firearms) from MERIWETHER's residence, XXX North 60th Street, Milwaukee, Wisconsin, on December 27, 2022.

KING then stated he was going to go "bust a move," and would be speaking with "Trell" (FRANKLIN). KING then departed the business, telling CS that he (KING) would contact FRANKLIN. KING returned approximately twenty minutes later. KING stated to CS that FRANKLIN approved KING to work with CS to conduct future firearms and narcotics transactions. KING stated that he (KING) would text his number to CS. Later the same day, CS received an incoming text from telephone (414) XXX-XXX0 indicating the number belonged to KING and was instructed to call KING.

Later that same day, CS received an in-coming call from MERIWETHER, using a Vermilion County Jail authorized cellphone. During their recorded jail call, MERIWETHER stated FRANKLIN would be reaching out to CS in the near future. Based on the prior conversation between CS and KING, case agents determined this discussion pertained to future firearms and narcotics transactions. Shortly after MERIWETHER's call, CS received an in-coming call from KING at telephone (414) XXX-XXX0, which was recorded by case agents. During this call, KING discussed having two Glock switches available for purchase. Shortly thereafter, CS received a call from FRANKLIN (at (414) XXX-XXX6) during which he told CS to reach out whenever CS was ready to conduct a transaction.

## C. PHONE EXTRACTIONS AND SOCIAL MEDIA

Case agents reviewed social media and phone extractions of the ADTO, including MERIWETHER. Throughout MERIWETHER's social media and phone extractions were photos and videos of large amounts of cash (Figure 1), firearms (Figure 2), and controlled substances.

10

 

(Figure 1)                                      (Figure 2)

Case agents also located messages discussing his drug and firearms trafficking. Additionally, located on his phone extraction were rap lyrics, in which he boasted about his drug trafficking.

### D. DEBRIEFS

Several debriefs with confidential informants (CIs) were conducted before and after the arrests of the defendants charged in the conspiracy. These debriefs detailed MERIWETHER's ongoing involvement with others in the ADTO to obtain controlled substances.

CI-1 described that 4-5 times in the past FRANKLIN purchased 2 kilograms of fentanyl for the ADTO. CI-1 described how the ADTO would then cut the kilograms in hotels in the Milwaukee area, such as the Economy Inn, American Inn, and Diamond Inn and turn it into 8 kilograms of fentanyl. CI-1 also stated that FRANKLIN would get two pounds of methamphetamine for the ADTO.

CI-2 provided information regarding FRANKLIN, MERIWETHER, and RODRIGUEZ PEREZ. CI-2 stated that FRANKLIN would mix black tar heroin with fentanyl, which he received from MERIWETHER. CI-2 stated that MERIWETHER had his own unidentified Milwaukee-based fentanyl source as well as his own Texas-based black tar heroin source. CI-2 stated Franklin later introduced MERIWETHER to RODRIGUEZ PEREZ, at which time MERIWETHER began purchasing 100 grams of heroin at a time from RODRIGUEZ PEREZ. CI-2 stated that MERIWETHER would cut the heroin in CI-2's presence and would turn 100 grams in to 500 grams.

11

CI-2 was also aware of MERWIETHER's arrest. CI-2 stated that FRANKLIN had been to KING'S residence the day before MERIWETHER was arrested. CI-2 stated that FRANKLIN and MERIWETHER had purchased 100 grams of fentanyl. CI-2 stated that FRANKLIN and MERIWETHER cut the 100 grams of fentanyl to make 1,000 grams at KING's residence.

CI-3 stated that he/she was introduced to the ADTO at the end of 2022, following FRANKLIN's arrest. CI-3 described that when FRANKLIN was released from custody, he was with MERIWETHER more frequently. CI-3 purchased a total of 150 grams of heroin from MERIWETHER's ADTO.

## E. DRUG WEIGHT

Based on the controlled buys, statements made by MERIWETHER during the investigation, debriefs, phone extractions and social media, MERWIETHER responsible for the distribution of at least, as a conservative estimate, 32 kilograms of fentanyl, 376.34 grams of para-fluorofentanyl (fentanyl analogue) and heroin, 7 pounds of methamphetamine, and 29.72 grams of cocaine during the course of the conspiracy.

## F. FIREARM TRAFFICKING

Based on the controlled buys, statements made by MERIWETHER during the investigation, debriefs, phone extractions, and social media, MERWIETHER is conservatively estimated to be responsible for the illegal sale of 18 firearms and 6 machineguns during the course of the conspiracy (see below outline).

| Date | Glock auto sear | Firearm(s) |
|---|---|---|
| August 29, 2022 | 1 | Glock, model 21, .45 caliber handgun bearing serial number DST613US |
| September 12, 2022 | 1 | Century Arms, model NAK9 (Draco), 9mm firearm with a drum magazine, with serial number RON216548; Radical Firearms, LLC, model RF-15, firearm bearing serial number 21-105263; Taurus, model PT111 Millennium G2, 9mm pistol bearing serial number TKM53277 with an extended magazine; Smith & Wesson, model Bodyguard, 38 special pistol bearing serial number CPX2831. |
| September 22, 2022 | 1 (on Glock) | Freedom Ordinance, model FX-9 AR-style, pistol bearing serial number 010897 with an extended magazine; Glock, model 19X, 9mm pistol bearing serial number BKCC540 with an extended magazine and 28 rounds of ammunition; Glock, model 21, .45 caliber pistol bearing serial number XNS459 (switch attached) with 11 rounds of ammunition. |

12

| October 5, 2022 | 0 | Glock, model 22, .40 caliber pistol bearing serial number BVK7876 with Glock auto-sear device attached and 14 rounds of ammunition; Franklin Armory pistol bearing serial number P-17412 with 10 rounds of ammunition. |
|---|---|---|
| October 19, 2022 | 0 | Taurus, model PT92, 9mm pistol bearing serial number ADD252348 with 12 rounds of ammunition; and ROMARM, model WASR-10, rifle bearing serial number A1-1827-13 with 10 rounds of ammunition.[2] |
| October 27, 2022 | 3 (On Glocks) | Glock, model 22, .40 caliber pistol bearing serial number WHX146 with 13 rounds of ammunition and Glock auto-sear device; Glock, model 17, 9mm pistol bearing serial number BTVX769 with 11 rounds of ammunition and Glock auto-sear device; and Glock, model 17, 9mm pistol bearing serial number BVBN256 with 30 rounds of ammunition, an extended magazine, and Glock auto-sear device. |
| November 16, 2022 | 0 | Anderson Manufacturing, model AM-15, pistol bearing serial number 22019470 with 26 rounds of ammunition. |
| December 6, 2022 | 1 (on Glock) | Anderson Manufacturing, model AM-15, pistol bearing serial number 19335796 with 40 rounds of ammunition; and Glock, model 45, 9mm pistol bearing serial number BUFB412 with a Glock auto-sear device installed and 17 rounds of ammunition. |

---

[2] This firearm was connected to a homicide that occurred on April 18, 2022. Meriwether also indicated that the firearm belonged to his deceased cousin.